Please rise. The Honorable Judges of the United States Court of Appeals for the Third Circuit. Oyez, oyez. All persons having business with the Honorable United States Court of Appeals for the Third Circuit, I'm honored to draw near and give their attention, for the Court is now in order. The Honorable Judge of the United States Court of Appeals for the Third Circuit, I'm honored to draw near and give their attention, for the Court is now in order. Before we move to questions, Ms. Garland? Good morning. Good morning. May it please the Court, my name is Rachel Garland and I represent the Hayes family. I'd like to reserve three minutes for rebuttal. Granted. Thank you. The Enhanced Actual Statute protects a small, specific group of tenants, such as the Hayes family, from arbitrary displacement from their homes. The Enhanced Actual Statute solves a particular problem in a limited situation and is best understood in the context of the two related larger subsidy programs, the project-based programs and the regular tenant-based voucher program. The problem that Congress is trying to solve is what to do with tenants, such as the Hayes family, who are living in project-based properties when the owner chose not to renew the subsidy contract for the entire property. Congress could have legislated that these tenants receive regular tenant-based vouchers. Congress chose not to do that, and instead they enacted the Enhanced Voucher Program, specifically to protect vulnerable tenants from forced displacement from their homes, maintain neighborhood stability, and fairly compensate landlords. In doing so, they created a bridge from the project-based program to the regular tenant-based voucher program. My first point this morning is that enhanced vouchers are inherently not regular tenant-based vouchers. They are distinct from regular tenant-based vouchers in two key ways. As currently enacted, the Enhanced Voucher Statute has two clauses that I'd like to focus on this morning that depart from the regular tenant-based voucher program. The first is the clause that says an assisted family may let to remain in the same project. This clause clearly places the choice on the tenants as to whether or not to stay in the property, and it protects them from arbitrary eviction at the end of their lease term. What this effectively does is it extends the due cause protection that tenants in project-based properties have at the end of the lease term to enhanced voucher tenants. This is a clear departure from the regular tenant-based voucher program, where at the end of the lease term, a landlord is not required to have a cause in order to evict a tenant. The second key difference between the Enhanced Voucher Program and the regular tenant-based voucher program is the subsidy payment. The statute goes on to say that, and if during any period the family makes such an election and continues to so reside, HUD is required to pay the landlord full market rent. This, again, is a difference from the regular voucher program, where the subsidy payments are usually capped by a local payment standard. We must interpret the Enhanced Voucher Statute as giving a right to remain to tenants that has two key elements, the right to choose whether or not to stay and the financial right. Key principles of statutory construction require that we give meaning to both of these independent clauses and that we not conflate them into one right. This interpretation is supported by legislative history. Within one year of enacting the statute, Congress amended the statute specifically to include that first clause in the May elect to remain language. In doing so, the House Conference Report says, quote, the committee has included language clarifying that assisted families continue to have the right to elect to remain in the same unit of their project. HUD guidance and persuasive case law over the past 17 years have continually reinforced this. HUD has said over and over again that owners must continually renew the lease of an Enhanced Voucher family and that the right to remain extends beyond the initial year of assistance. My second point is that the Enhanced Voucher Statute does not create an endless lease. This is a specific fix to a finite problem, and really the choice is the landlord's. As long as the landlord, such as Mr. Harvey, continues to use his property as a private rental investment property, all Congress is asking him to do is to keep good tenants, such as the Hayes family, in the property with guaranteed full market rent. Any upgrades that Mr. Harvey makes to the property will be matched by an increase in rent. If the Hayes family stop being good tenants, if they stop paying their rent, if they otherwise breach their lease, or if they choose to move out of the property, then the unit will revert back to the private market and there's no more obligation or subsidy tied to the unit. This has already happened in four out of the six units in this particular project. The Enhanced Voucher Program is a specific small program intended to address this exact scenario. Congress moderated a balance between tenants' rights and the individual property rights of landlords. It provides for fair compensation for the landlords and a path for these landlords to remove their properties from the subsidy program. We ask this court to enforce Congress's carefully moderated balance and reverse the lower court decision. We pause as required to not renew the Enhanced Voucher lease of the Hayes family. On the basis of this record, there is no good cause to evict the Hayes family. Thank you. You have answered, at least in part, what was going to be my first question, and that is that whether or not a right to remain exists, Harvey can still evict the Hayes family for good cause, and good cause is spelled out, at least in several forms, correct? Correct. If he wants to renovate, right? So, right now, the only place that good cause is defined by HUD or in the statutes for any of the subsidized programs, there is no definition for good cause. It is left up to the courts to interpret. HUD also never defines good cause. The regulations don't set out something? Only in one context. The only regulation is 982.310, which is the regulation for the regular tenant-based voucher program. That is the only time HUD or the statute has ever defined good cause. This came to us on a summary judgment. So, what does the record show with respect to whether or not Hayes wanted to renovate the unit or whether Hayes wanted to move a family member in? The record shows that that's what Mr. Harvey stated in his eviction notices. Which one? Renovation of a family member or both? The first eviction notice references renovation. The second notice references renovation and moving a family member in. However, the right to remain, and I think it's important before we get into the details, is that the right to remain is tied to the project. It's not tied to a particular unit in the project. But it's subject to cause. Is there an argument here that eviction is because of cause? It's a good cause-based eviction? Mr. Harvey's first argument, as I'll explain, his first argument is that he doesn't need good cause at the end of a lease term. And his second argument is that even if he did need good cause, he has good cause in this particular settlement. The district court resolved this on the first issue. Right, they never reached the second issue. All right, so why wouldn't it be appropriate, assuming then that good cause, if demonstrated, could be an appropriate basis for evicting the tenant, why could we not remand this to the district court to conduct proceedings, evidentiary proceedings, to demonstrate whether or not good cause exists? You could, yes. If you get past the first hurdle. Until now, we've never gotten past that first hurdle. The district court stopped and said that there was no good cause required at the end of the lease term. So if this court were to rule that good cause is required at the end of the lease term, the next question is, is there good cause in this case? Could you please go back to 918.310? Yes. 918.310 was enacted in 1999 before the enhanced voucher, sorry, was issued as regulations by HUD in 1999 before the enhanced voucher statute was enacted. 918.310 specifically refers to good cause in the regular tenant-based voucher context. HUD has never promulgated regulations for the enhanced voucher program. Two years ago, a proposed rule was issued. There has been comment and notice period. It's now under review, and HUD will explain that final rule has not been issued yet. So we don't have a definition of other good cause specifically for the enhanced voucher context. What would be the basis for treating good cause as different for the enhanced voucher than the regular tenant program? So this is exactly what Barrientos looked at, the Ninth Circuit and Barrientos looked at, is whether or not good cause should be treated the same in the regular voucher program as it should be in the enhanced voucher program. And what the court in that case decided was that you have to look at it in light of the enhanced voucher statute's right to remain. In that particular case, they had to look at it in that the enhanced voucher statute guarantees full market rents to the landlord. So the landlord was saying, well, I want to raise the rent, and that's why I want to evict the family. And the court said, well, if you want to raise the rent, raise the rent, and HUD's required to pay it as long as it's a reasonable rent. So that can't be a good cause basis. That might be a good cause basis in the regular voucher program where the subsidy is taxed by a local payment standard, and if the landlord raises the rent, the tenant might not be afforded to stay there. Ms. Gorland, you acknowledge, of course, that Mr. Harvey purchased this property in 2010, and he purchased it not subject to any more need to pay cash to Pine Street Associates and then he entered into a lease. He entered into a model lease agreement with HUD and with the Hayes family. You acknowledge that, right? Yes. On page 650 of the appendix, that lease appears, and section 19 of that lease is entitled Author of New Lease. It says the owner may offer the tenant a new lease for the term beginning at any time after the initial term. It doesn't say shall offer. It doesn't say must offer. It says may offer a new lease. How do you get around the fact that this and the half agreement, which Mr. Harvey signed, are really the only commitments he made to the Hayes' and to HUD involving this property, which he owned free and clear. How do you get around that? Contracts don't trump federal law. What part of the Constitution says that? When you sign a contract, you sign it subject to the rights and requirements laid out in federal statutory law. Under this program, doesn't this program specifically say that it's consistent with state law and isn't property rights in Pennsylvania defined under state law? Just to be clear, while it looms, it seems to me, out there in a ghost-like fashion, preemption has not been a part of this case, an issue that has been resolved, right? No, it has not been raised until this point. So the supremacy clause requires that where federal law conflicts with state law, federal law will control. So in this case, the federal statute requires that the choice be the tenants as to whether or not to remain. How long? Isn't that what we're wrestling with? We all agree the statute said they may elect to remain, but for how long? When does it end? So the statute clearly gives an answer that it only is tied to that specific unit and that specific tenant. So if that original family moves out of the unit, I'm asking you a bit. Forget about the abstract. In this particular case, when does the Hayes family's election to remain end? What year? There's not an exact year. There's at the point where the family moves out of the unit, at the point where there's good cause to evict the family. So it could be 10, 20, 50, or 100 years. It's a life estate. It's not only a life estate. It's an intergenerational life estate? It's not an intergenerational. The statute clearly says... Well, the tenant on the lease has already passed on. And under the law, they have a right to substitute another family member, and that was done here. And I think that means that, credit where from wrong, that if Mr. Theodore Hayes were to move away, were to pass on, then you could substitute Ms. Froegle, et cetera. Or is that not right? Indeed, that hath happened. Indeed, that hath happened. Mr. Hayes moved out, and Ms. Froegle has now been processed as the head of household. But she was one of the original tenants. She did not move into the property. What I'm trying to get you to say, Brenda, is that maybe the answer is it doesn't end. Harvey will never have peace of the absolute over this unit, as long as Ms. Froegle and her family wishes to continue living there. I disagree. The lifetime of the family ends. Explain that, please, because we're on the fourth generation, right? Aren't we on the fourth generation? We've got the mother who passed, and then Mr. Hayes, who's moved out, and now his niece, the granddaughter, and now her children. So, theoretically, when the niece, or whatever it is, may choose to move or is out of the house, her children will be in the house, and we'd be hearing the same argument, right? So, isn't there, in fact, an intergenerational family estate that never ends, unless and until he withdraws the unit from the rental unit, or there is good cause, as you describe it? Yes, but only because these four generations all happen to be on the lease at the time of the op-down. So, at the point from when it went to project lease to an enhanced voucher, this particular family happened to have four generations on the lease. But it doesn't happen that often. In the other enhanced voucher unit that Mr. Harvey has downstairs, it's just one elderly woman on the lease. So, the timeline is different for each family. Assisted family within the meaning of the statute within 1437 FT1B. Assisted family means who's ever on the lease at the time of the change. Yes, and the statute says that. If you looked at T1C. And we looked at the lease, we would see the great-grandchildren are on the lease? Yes, they are. The record shows that all four generations were on the lease when Mr. Harvey and the assisted family signed it in November of 2010, backdating it to May of 2010. And the statute specifically says, if you look at T1C, subsection 2I, the voucher is made available for use by any family other than the original family, on behalf of whom the voucher was provided. That's when it terminates. So, we can't pass it on to someone else. The children, Ms. Vogel's children, they become adults. Correct. And then they have children. Right. Their children. So, now we're in the great-greats. Could they be part of the original family? I think the statute says that they're not. They're not? So, the original family is defined by who's on the lease on the day of the eligibility event. That's what the statute says. Is this a voucher? I mean, isn't there now a limited rate for their occupancy? No. The owner has been receiving full market rent this entire time. Guaranteed full market rent. Guaranteed full market rent under the statute. And any other reason to address that, had it wanted to? Had it had a concern with a fourth or fifth or sixth generation of the pro-luxemarian, similar to Rodney DeHunt at all? Had Congress wanted to address that? Could it have worded the statute to do that as opposed to the 2000 Amendment and the way it's worded? Congress, at any point, could have limited the statute durationally. It could have said just for the first term of release or just for the first generation of the family or only for five years. At no point in the statute is there any language limiting the enhanced voucher. Instead, all of the language ties the right to the assisted family in this particular unit. So, the choice is the family's. During any period, the family makes such an election. All of the language is durational. So, all of the language shows that as long as Mr. Harvey continues to use this as an investment property. Now, so, were Mr. Harvey to tear down the building and turn it into a tennis court? He doesn't have to keep renting. But the term then becomes sort of irrelevant. One of the incongruities, I think, here is that you conceded that during the term of the lease, an eviction could occur for a number of reasons, right? Good cause is always required to evict during the term of the lease under all the subsidy programs. It just seems odd that the landlord could move to get a tenant out of his property during the pendency of a lease but can't move to do so when the lease is over. No, again, I disagree with you. All that we're saying is that that same good cause reason that would be required during the term of the lease is also required at the end of the lease. There is no higher barrier at the end of the lease than during the lease. It's just, it's the same. So, during the term of the lease. So, the lease term then really does become irrelevant. There is no lease term. No, because at the end of the lease term, even under the regular voucher program, even when the landlord is keeping the same family, there's certain terms of the lease can be negotiated. No, no. It's responsible for utilities. No, the term, when I said lease term, I mean the length of the lease. That's the most important point, right? Do I have one year? Do I have two years? Do I have five years? You know that at the end of the term, the deal's off. We don't have a deal anymore. But as I take your argument, there really is no lease term. It's a continuous lease as long as the people that were originally on there wish to be there. I disagree. There is a lease term, and at the end of the lease term, there are certain parts of the lease that can be renegotiated. So, that lease term is important. Just like the public housing lease, the Section 8 project-based lease, the low-income housing tax credit lease, all of these leases require good cause not just during the lease term but also upon renewal. But all of these leases have terms because certain things may be renegotiated between one term to the next term. But why would this Section 19 that I referenced to you in the lease, because they may offer a new lease, why would HUD put this section in this lease if they didn't have the right to not renew the lease at the end of it? So, the lease that the Hayes family and Mr. Harvey signed is the model lease that the Section 8 program gives out for regular voucher programs. Well, they gave that to Mr. Hayes for this property. And that was in his case. Mr. Hayes didn't prepare this lease, did he? Mr. Harvey, excuse me. Too many aces in this. Mr. Harvey did not prepare this lease. No, that is the model lease given out by PHA for the regular tenant-based voucher program. But they gave it to Mr. Harvey for this property, right? PHA's mistake does not negate the rights that the tenants have under statutory federal law. The Tenant Protection Statute, 12 U.S.C. 1715b1b, specifically requires that enhanced voucher tenants be given leases that require good cause to evict a family. Mr. Harvey may have a case against PHA. He may have a case against HUD. But in this particular instance, he is required and he is bound to renew the lease unless he has good cause to evict. HUD's guidance that you point to talks about, says this protection continues as long as the project is offered for rental housing, absent good cause to terminate the tenancy. Didn't the notice that was given to the Hayes family specifically indicate that they were taking it, that it would no longer be rental housing? Yes, but the right to remain is tied to the project. There are two other units on either side of the Hayes family's unit that are identical except that they have been renovated. Both of those units go back on the rental market on almost an annual basis. Both of those units are private rentals. There are no more enhanced voucher families in either of those units. Mr. Harvey can either move his daughter into either of those units or he can move the Hayes family into either of those units if he wanted to move his daughter into the specific unit that the Hayes family remains. You're essentially saying that you want to disregard that part of HUD guidance and say that Mr. Harvey has to keep that unit on the rental market. No, what I'm saying is that a good cause analysis is a fact-specific analysis on a case-by-case basis. In this particular case, I'm not saying that that's not a good cause to evict. I'm saying in this particular case, because the right to remain is tied to the project, if Mr. Harvey wanted to move his daughter into that unit, he could. He has that option. All he would have to do is move the Hayes family into one of the neighboring units. And he's not free to withdraw it from the rental unit without moving the Hayes family into another of his properties? Not in this particular case. What in the statute requires a landlord to provide alternative housing if the landlord chooses to remove the housing unit they're in from the rental market? Because the right to remain is tied to the project. It's not tied to the individual unit. The language of the statute is that the assisted family need a right to remain. Do you have any case at all that says that? Because you've withdrawn that housing unit from the rental market, something you say they're free to do. In fact, you started by saying this is all the landlord's discretion. They're perfectly free to withdraw it. Now you seem to be saying, no, you're not free to do it. If you take that off the market, you've got to put the Hayes family in another one of your units. So which is it? Is it at his discretion or not to pull this unit off the market? It is at his discretion to pull that unit off the market, but because he has two other available units, the right to remain requires that he move them into the other units. What if he didn't have available units? Then on a case-by-case analysis, you might have good cause in that case. In this particular case, he happens to have these two other units. Is that because Mr. Harvey bought more than five units? In other words, because what he bought remains within the definition of multifamily project. Would the right to remain still apply in your view if the purchaser was purchasing a single unit or two or three less than five? You may answer the question. Thank you. Mr. Harvey only bought a portion of the larger project. The project was originally 14 units, and Mr. Harvey purchased one of the property parcels that happened to contain six units. So the right to remain is tied to the project, which if we're looking at good cause in this particular scenario, we would say Mr. Harvey doesn't have good cause to evict the Hayes family, even if he wants to move his family into one unit. If all Mr. Harvey had done was purchase one of those units out of the project, we would still say that, yes, the tenant has a right to remain in that unit until such time as Mr. Harvey has good cause to evict. Thank you, Ms. Garland. We'll have you back in a moment. Thank you. Thank you. Ms. Randazzo. Good morning. May it please the Court, my name is Susanna Randazzo on behalf of the appellate Philip Harvey. At the outset, my client and myself want to express that anybody's heart goes out to the issue of But this case is not about that. This case is about the right of a private American citizen who owns a property, who purchased the property without any deed restrictions, with no encumbrances on his lien, whether or not the tenant that lives in his property has more rights than the actual property owner. And the answer would be no in this particular case. We need to look at there's actually four things that control in this case. The most important thing is at the time when Mr. Hayes purchased the property, Mr. Harvey, I'm getting all the H's confused as well, when Mr. Harvey purchased the property, there was no deed restriction on the property. And it's very common for HUD, whenever there is a project-based property, to put liens or restrictions on the mortgage. So if a property owner who is building a property with a mortgage held by HUD, the deed will have restrictions such that that property owner cannot convey it without the approval of HUD. That did not take place in this particular case. The only thing that happened is when the property was purchased, there was, in fact, a lease agreement or a contract with the local Philadelphia Housing Authority. So at the time of purchase of these six units, there is one property, and there's actually another property, but all the properties have leases. One property, in this particular case, the property where the Hayes or Mademoiselle resides, had a HAP contract which my client entered into with the Philadelphia Housing Authority. As Your Honor pointed out, the lease agreement itself has a lease term. So when, again, my client purchased the property, no deed restrictions, the lease provides specifically that there is a lease term, and it specifically says that the owner may terminate the lease at the end of the lease term. The HAP contract entered into with the local housing authority specifically states that the contract also has a lease term. So when my client did his due diligence and purchased the property, there is nothing restricting him looking at the lease, looking at the HAP contract, looking at the deed, nothing restricting his ability to do what he wants with the property, again, given there is a lease agreement, but once that lease expires, there is nothing else controlling. What else do we know in addition to the lease and the HAP contract? The statute itself is clear. If you look at the enhanced voucher statute, it begins by saying that this is a regular voucher and is to be treated like a regular voucher with the exception regarding the rental payment. That says it loud and clear when you read the statute, and it's in the very beginning of the statute. So the Congress starts the statute by saying that this is a regular statute for all intents and purposes, with the exception that the tenant may elect to remain and HUD is required to pay the increased rental amount. Now, why do we know that HUD or, I'm sorry, Congress intended for the statute when they made the amendment in 2000, why do we know that they intended it to be something for HUD to take control, that HUD needed to pay the increased rent? Because if you look at the Congressional record, and if you look at the notes of Congress dating back to even 1998, there was a Senate hearing on July 7th, 1998. Mr. Mack indicated that the concern was that the HUD's interpretation of the way the statute was written was causing tenants who elected to remain to pay higher amounts of rent, and they couldn't afford it. So these tenants were forced to leave the premises, even though they had elected to remain. So at the time, Congress was concerned. Well, that's legislative history, Ms. Vendetto. Let's look at the statute itself. Let's look at the language, it's 1437-FT-1B. Is your reading of that that we should see it as the assisted family may elect to remain, language is actually the assisted family might elect to remain if given the option?  What I'm suggesting is that the family may elect to remain if they want to at the time of eligibility. Don't you find it interesting that Congress chose to say may instead of might here? Yes, it is interesting, but if you look at the legislative intent and the history behind the making of this law, the purpose was that their concern was that HUD was not stepping up to the plate and paying the increased market rate rent. Let me put it another way. Isn't it really redundant? Wouldn't it be redundant for Congress to write this statute as may elect to remain? And wouldn't the language really be superfluous if all that was really intended with the tenants might remain the same? I disagree to the extent that the may elect to remain is in essence telling the tenant that they may elect to remain. And if they elect to remain, because it says and if during such period the family makes such election, HUD is required to pay the differential in the enhanced voucher. So now HUD is paying market rate as opposed to- What's ambiguous about may elect to remain? First of all, you have to look at the statute as a whole. It starts out by saying the enhanced voucher under this subsection for a family shall be a voucher assistance under subsection O of this section, which takes you back to the regular voucher, except that under such enhanced voucher assistance the family may elect to remain. It can't be just about the money. May elect to remain has to mean more than getting an enhanced payment. How long? Well, you used the same question I asked Ms. Garland. How long, under your view, do they have a right to remain? It is our position that after the one-year opt-out, which was given by the previous owner. Recall my client did not own the property at the time of conversion. And after that one-year period passes, which had passed in 2009, my client did not send a letter to the family until 2015, so sufficient time had lapsed. But after that one-year opt-out notice is given, at that point the tenant or the landlord, I should say, could move for eviction or terminate the tenancy based on this particular case. By virtue of expiration of the lease? By virtue of expiration of the lease. Then what does may elect to remain mean? How is it that, you know, you've certainly read the opinions from the panel, and you've read all the other opinions, Park Village and all the several district court opinions. How is it that may elect to remain doesn't just end up illusory and meaningless if the statute means what you say it means? What meaning does it have? First of all, if Congress intended that the family live there. Well, I'm not asking about Congress's intent here. I'm asking, like, just look at the language. What does the language mean? What content does that language have if, indeed, as you say, all that has to happen is the landlord says, I'm done? The may elect, if you look at the voucher program in totality, under the voucher program, if the tenant moves to another location, they, assuming that they still qualify, they can move to a different apartment and that voucher goes with them. Sure, but that doesn't speak to may elect to remain. That's what I'm trying to get to. Yes, and that's where I'm going. Yes, so the may elect to remain is, in essence, providing that if the tenant chooses to remain at the unit, at the enhanced voucher unit, and continues to do so, assuming that there is still a lease and there hasn't been a cause for eviction, if they elect to do so, the HUD has to pay the increased market rate rent. That can't make sense, right? Because if you look at the Multifamily Assisted Housing Reform and Affordability Act of 1997, right, so that's before 99 and before the 2000 amendment, right, that already required HUD to provide enhanced vouchers to eligible families. So under your interpretation, what does the may elect to remain language add to the 97 statute? Because what was happening is that tenants that were electing to remain in cheap properties that had been converted, they themselves were required to pay additional rent and they couldn't afford it. So what was happening was that at the time of conversion, after that one-year opt-out, the rent went up, and when the rent went up, HUD was only paying that portion that they were entitled to under a standard voucher. I'm sorry. I'm going to interrupt that. I beg your pardon. Okay. I beg your pardon. According to what I just read, HUD was already obligated in 1997. Now, so if I understand you correctly, HUD was not moving up to its obligation? Correct. So you needed to say may elect to remain to require HUD somehow would now be required to do what it wasn't before? I don't understand. Correct. If you look at the congressional history, that is exactly what was happening. In any of the cases that Judge Jordan referenced in this question, do you agree with your interpretation of the 2000 amendments? I apologize. In any of the cases Judge Jordan mentioned that you've read all the cases, and of the district court cases, it's a certain court case. What happened was, had any of those decisions agreed with your interpretation of the 2000 amendments, other than the district court here? Yes. And all of those cases, first of all, they can be distinguished, because in that particular case it was the opt-out landlord who was seeking the eviction. You can recall that our landlord, my landlord here, is not the opt-out landlord. He was not the original project base. But multiple cases indicate that leases cannot be, these enhanced vouchers cannot be endless leases. There is the- Well, I'm not saying they can't be endless leases. I don't think anyone, Jordan, I don't think Judge Reno is suggesting that there is an endless lease. That somehow the key title is then restricted in sensitivity from the owner. Because there are limitations on the duration of the lease. And your question is really about the term of the lease, but it's not a situation where the term is defined in terms of years, but in terms of who has the legal right to occupy the premises, and that's defined by who's on the notice at the time the lease is executed. It may be just the original occupant. It may be the original occupant's kids. It may be the original occupant's grandchildren, depending on who's in existence and who's on that notice. So it's not a perpetual lease unless somehow folks have come up with the answer to this secret of life and we're going to live forever. It doesn't end on it. So let's look at the practicality. If the intent of this statute was that the tenants could live there indefinitely or, in your words, there is a specific term. The practicality of it doesn't even make sense. First of all, we don't really know, because my client was not privy to those documents, who was present at the lease at the time of conversion in 2008. There was a man who was present. He could look at the lease and see who was on there, and he looked at your meeting and see who was on there. What notice was the purchaser given in terms of who has the right to occupy the premises now or in the future? So looking at the statute, what the appellee is arguing is that in terms of the enhanced voucher, the residents who were living at the property at the time of the enhanced voucher. No, actually, I don't think she said that. I think if I understood her correctly, she said the people who were on the lease at the time of the conversion. Right? Correct. And she said it's a little unusual that all four generations are on it, but it is a defined set of people. So the question I think being put to you is why can't Congress sensibly, in effect, grandfather the people who are on the lease, that intend to say, okay, we're moving away from this project-based program, but if you want to stay there, you, the people on that lease, you can stay there as long as you're good tenants. Why can't Congress make that judgment and write it into law and have it be perfectly logical and sensible? But it's not in the law. That's what we're arguing. So you're not disagreeing that that could be done. You just don't think they did it, right? Correct. It's not in the statute. There's nothing unconstitutional about Congress saying, hey, we're going to grandfather these people, and the owners of this property, whether it's the owner who owned it originally or somebody who buys it later, they're going to be under this statutory requirement to allow this grandfather's family on the lease to stay. That would be perfectly constitutional, right? Perhaps, but in this particular case, no. Perhaps. You've got to give me an argument. I can give you an argument that those would be a different set of facts which do not exist in this particular case. I'll try to go back to your, so the original, well, what I was saying. Let's take one of my questions, because we're going to break off and get his question in that way. Answer his question. Is she answering a question or your question of his question? That's a good question. If private property owners want to do business with HUD and the federal government, then the federal government can put all kinds of conditions on it. They can. And that goes back to my original statement. What are those conditions, right? And that didn't happen here. When I started off by saying that when there is a project-based mortgage or there is a mortgage that's held by HUD, HUD puts restrictions on the conveyance. Well, they put restrictions. In this particular case, there was no such restriction. Your position is that the statute itself can't affect any power over Mr. Harvey. It had to have been affected through some lien on his real property. Otherwise, the statute doesn't have an effect on him. No. If the statute had said that the enhanced voucher tenant has the right to live there in perpetuity. No. It does say may elect to remain. If the statute had specifically stated that the tenant's rights are greater than the rights of the landlord with the specific unit, then we're in a different situation. But in this particular case, my argument, and then going back, Your Honor, to your answer, when this conversion took place in 2008, my client was not privy to those documents. We can assume for purposes of the motion for summary judgment, we've never seen documents that Mrs. Fogle and her children were on the lease in 2008. We've never seen the documents. Are you arguing to me that you bought a property in New Jersey and didn't bring documents? We purchased the property. My client purchased the property in 2010. And at that point, my point was only that we were not privy. In 2010, we didn't know anything about the condition. I'm sorry. I apologize. I'm sorry. I just make a comment. You knew the lease happened in 2010 anyway, didn't you? In 2010, there was a lease, in fact, correct, in 2010. And that was renewed. And that was renewed. Correct. The lease that he was renewing. You're going back to something that is a little confusing to me, because I thought we had gotten to the point of agreement that the statute itself independently could put obligations on your client, right? And if that's true, what does it matter whether what he knew or didn't know about the property and the lease, et cetera, because if the statute has effect, it has effect, right? The argument then becomes what does the statute mean, not whether he had some notice in a deed or in a lien or otherwise, right? Well, we have a constructive notice in that case. The statute has effect on the opt-out landlord, which is not my client. So you're still taking the position your client's not bound by the statute because he wasn't the owner at the time of the eligibility event? Is that your position? The position is that the may elect does not permit the tenants to live there. I know you don't like the word perpetuity, but there is no endless lease. That the landlord is permitted. If anybody decides to raise an argument that involves the rule against perpetuities, I think I'm going to scream. Let me see that. You do agree that the tenants stay subject to good cause, right? If they misbehave under federal law, they can be removed. Under the terms of the lease, I'm assuming that the tenancy has not expired. Correct. What does the violation of federal law have to do with whether or not the term is expired? I think we're saying... Okay, let me make a more explicit hypothetical. We're talking in the context of good cause. You agree, God forbid, that if drugs were sold, right, that would be a violation of federal law. Correct. They could be put out, right? Correct. Okay, great. And so you also agree that subject to other things that would fall within the ambit of good cause, your client is not left remedy-less with regard to whether the Hayes family comes or goes. Yes? If I could just summarize the argument in this particular way. The argument is that in this particular case, there is a lease agreement that is in effect. The lease term ended. And at the expiration of that lease term, my client sought to evict this family because he wanted to renovate it and also move in his daughter at the time. The cause is applicable if my client was attempting to evict this family during the term of the lease. So if the lease had not expired and he was seeking to evict them in the middle of the lease term, then he would need cause to evict them. The argument here is that the lease had naturally expired. And at the natural expiration of the lease term, my client sought to evict the family. And that is the essential question. One has also expired at the time, but Judge Chigaris had wanted to jump in and I'll give him that opportunity. Just quickly, tiered up here is HUD, of course. They don't agree with you. How should we weigh their brief? Their brief should not, with all due respect to him, their brief does not meet the Chevron standard. Not Skidmore. Skidmore. And in this particular case, because their interpretation, it's their interpretation of the statute, which is just not correct based on the fact that it's their obligation to continue to pay. Despite their expertise in the area. I think the congressional records indicate that there has been some miscommunication between what Congress intended and what HUD was, in effect, doing. Thank you, Ms. Infantso. We'll hear from the amicus. Infantso. Synsac. May I please report? Jerry Synsac, appearing on behalf of HUD. HUD has long interpreted the enhanced voucher provision as providing tenants with a right to remain in their homes, such that they may not be evicted even at the end of a lease term, unless the owner has cause to evict or chooses to remove that unit from the rental housing market or if the unit is otherwise no longer eligible for rental assistance. HUD's interpretation follows from the plaintiff statute and, importantly, it also follows from the statute's statutory history. As you already know, in 2000, Congress amended the statute to expressly add the phrase that the assisted family may elect to remain in their home. HUD's interpretation gives independent meaning to that clause and avoids rendering that clause superfluous. Now, as I mentioned, HUD has long interpreted the provision this way. It issued the interpretation contemporaneously with the passage of the statute. HUD was, of course, involved in the legislative process that led to the passage of the enhanced voucher provision and therefore had insight into congressional intent. It has adhered to that view in the early 20 years, 18 or so years since it first promulgated that guidance. It's a reasonable interpretation as evidenced by the fact that numerous federal courts have also agreed with it, including the Ninth Circuit expressly agreeing with it in the Park and Village case. And, of course, HUD has expertise in this area. For these reasons and others, HUD's interpretation is entitled to substantial weight. I think at the outset, and this has already been discussed to some extent, I would just like to say interpreting the provision, it is important to understand the context in which it arose. It arose out of the legacy project-based assistance programs, and it was through those programs that HUD and the federal government provided long-term financial assistance to project owners to build and operate housing projects. In exchange, the project owners agreed to rent the units to low-income families at below market rates. But at the same time, those long-term project-based contracts provided individuals with protections from eviction and so forth. And so as a result, the tenants, many of whom lived there for years, decades, and, in fact, now most of the tenants living there are elderly and disabled. And so in the 1980s and in the 1990s, Congress was faced with this issue in which the contracts were coming upon expiration or individuals or owners were given the option to prepay their mortgages after 20 years. And Congress wanted to recognize the right of those owners to charge market rents and to also release them from certain obligations. But at the same time, Congress recognized that allowing them to raise their rents to market rates would effectively force the tenants who had been living there, again, many for many decades, to not only leave their homes but also likely leave the neighborhoods in which they had been living. So enhanced housing provision was really the balance that Congress struck. As has been noted, it allows owners to charge the market rates for all of their units. And for those units in which someone agrees to stay, the government subsidizes that market rate. And then, on the other hand, it provides tenants with the right to stay, those long-term tenants, a right to stay in their units, and it provides the financial means to pay that market rate. And so HUD's interpretation of course was that balance struck, and we'd ask the score to adopt it. Those are my prepared remarks. I did want to respond. I think the question has arisen about how long the lease will last, and I did want to respond to that. And this has already been said, but HUD defined an assisted family as a group of individuals who are living in the unit. So the assisted family would be the individuals who are living on the date of the conversion from project-based to the opt-out. So whoever those individuals who are living there at that time constitutes the family. So as those individuals move out or if they pass away, that would relieve the obligation with the owner. So it's kind of intergenerational. And I think it might be if, in fact, and I don't know the full facts, but if, in fact, four generations happen to be living there on the date of the eligibility event, then it would apply to them but not to their children or additional family members who might have returned later and so forth. It's not the years and signs. I'm sorry? It's not the years and signs. No, it's not the years and signs. It's just the individuals who were living there at the time. And, of course, it's also true. It's living there, not on the lease. We're actually still on the five minutes. It's fine. I mean, you know, it's living. Yes, and HUD defines, again, under its requisition, assisted family as a group of people living there at the time. So I suppose if there were, someone could show that I was living there at that time, even though I was not at the lease, that might qualify. I don't think that's an issue that's worth adhering to or one that's been. Mr. Sinzak, Joe Chigares and a question to Ms. Rendazzo. Asked about Skidmore deference, I'm not quite sure what Skidmore does for you here, whether it's a thumb on the scale at all or whether you need it. What is your argument with respect to application known of Skidmore? Well, we believe Skidmore applies. As we pointed out in the brief, we have the plain text of the statute and its statutory history is alone sufficient and this court doesn't need to defer to HUD's use. But, again, given HUD's expertise in this area, given their experience with the Enhanced Action Program and the Project-Based Assistance Program and so forth that I suppose if there were a close call or if this court considered the statutory text ambiguous in some way, that deference to HUD's view as the tiebreaker of a thumb on the scale would be appropriate. Mr. Sinzak, could you talk a little bit about HUD's understanding of the distinction between a project and a unit? Take our facts to be that there was a 14-unit project, six of the units were sold off. Does that still remain the same project or a sub-project within it? Would it be if, as Judge Krause suggested, it were sold down to five or four or three or two or one? At what point does it stop being the same project? So the statute in HUD's guidance does say that the record remain attached to the project. And so it just hasn't been litigated as far as I understand. But it would be, the record remains in the project at the time of the conversion. It remains at the eligibility, but it still remains a project even though it's no longer project-based assistance. That's correct. So if there were multiple owners of what used to be a 30-unit project, then there may be, and one owner had calls to evict the person from his unit, but there was another vacant unit in the project available, then a plaintiff could argue that that owner should be joined and perhaps that owner would be required to lease the vacant unit. But again, that owner, of course, would be able to lease the vacant unit at market rate rents. Also, that owner presumably purchased a unit in a project-based assistance project and therefore would be subject to the same rules and regulations as any other purchaser. Of course. The rules are more being done in a way where the Department of Health comes in. That's a very different scenario, though, isn't it? The added factor that you put into your answer to my colleague. Well, I don't think that's connected here, but it is in terms of, it is defined in terms of the project. When does something cease to be a project? You know, I'm not sure. I mean, certainly it was a project at the time of the eligibility event, and that would be defined by the contract between HUD and the owner at the time, the long-term contract. Does HUD have any role in the model lease agreement? HUD does provide a model lease agreement for the ordinary voucher program. Well, then how can you square what you argued before with Paragraph 19 that Judge Fischer had reverted to? It says the owner may offer the tenant a new lease, but if that owner is required to renew the leases upon expiration as long as the residents so choose, then Paragraph 19 makes no sense. Well, that lease is for the ordinary voucher program, which does allow. Ordinary voucher program applies here unless there's something that's supposed to be the contrary, right? And it's Section T, the enhanced voucher provision. That is to the contrary here. There's nothing in T that says that when a lease expires, it doesn't really expire. Well, our interpretation of the clause may elect to remain, because, of course, under the natural reading of that provision and under the natural reading of landlord-tenant law, the election is to be the lease. The natural reading of landlord-tenant law is when a lease expires, the deal is off. Right. It just seems strange. You're suggesting that right to remain, elect to remain, is indefinite as long as the people on the lease wish it to be that way. But, you know, we've got these written contracts, and we've got property law, and you're saying that the contract that says it's a one-year lease or a two-year lease, that doesn't really mean anything. The Paragraph 19 that says the owner may offer a new lease, that doesn't really mean anything. All that matters is elect to remain. Well, to be clear, HUD issues guidance to owners and issues, in fact, a notice. He's not a HUD guy. I mean, that's one of the other tricky parts of the case. I mean, you had a deal with Pine Street Associates, right? So you could have put whatever conditions you wanted on Pine Street Associates. But this gentleman didn't have a deal with HUD. He finds it free and clear. So isn't it incumbent upon HUD, if you want to encumber his property, to put something in the chain of title that gives him notice that he's going to be encumbered? Well, Your Honor, of course, any owner of property is bound by federal law and bound to be knowledgeable of federal law. And I don't think there's any question here, as evidenced by the contract that Your Honor is referring to, that Mr. Harvey purchased the property well aware that there were Project 8 or Section 8-assisted individuals living there. Yeah, what about his provision in Paragraph 19 that says he may choose to renew it? Was he not supposed to? Would that mean it was his option whether to renew upon expiration of the term? I mean, he was under an obligation, as any owner would be, to know what federal law requires of him. What if Mr. Harvey, at the time he signed that first lease, said, You know what? Unless I get the full benefits of Paragraph 19, I'm not signing this first lease. Would the Hayes' have the same claim under the enhanced voucher because there was a prior lease with Pine Street Associates? Would we be in the same position today? Yes. I mean, the may elect to remain clause provides a right to a lease for an enhanced voucher tenant. Okay. One of the things in your guidance which you've offered, you do recognize that the protection that you've talked about here today and that your guidance refers to only continues as long as the project is offered for rental housing. That's correct. Okay. In this case, Mr. Harvey gave two notices, one which said he wanted to renovate the building before the lease expired. The other one, after they hadn't left, said, I want to renovate and move a relative in. Why doesn't that fall within your guidance? Your Honor, if Mr. Harvey could prove those things, I mean, so that's But didn't the district court in granting some of the judgment find that? I don't believe the district court did find that. My interpretation of the district court's opinion was simply that the judge found that Mr. Harvey didn't need a reason for evicting the tenant. And so if on remand, and this was an additional question, if on remand the district court were to find that he had cause to evict the tenant. So you recognize then that the right to remain, if elected, isn't absolute. It is not absolute. I agree with that. So there's renovation, there is taking it out of rental market, there's violations of federal law. Absolutely, Your Honor. And what about the right under state law in Pennsylvania that a person who owns a property has a right to not renew a lease? Isn't that a right that Mr. Harvey has under the law of the Commonwealth of Pennsylvania? I presume it is a right under the law of Pennsylvania, but in this case, the enhanced property provision in federal law would trump or preempt that requirement. What gives the Congress the right to do that? The Supremacy Clause, as well as, you know, in terms of what was their right to pass a solution, the Congress Clause would provide... The Supremacy Clause is a nice clause to cite. But does it only apply to rights that are delegated to Congress? That's correct. So, I mean, Congress would have the authority to pass this legislation under the Congress Clause, for example, and then once it had the authority to pass it, it would pass it. But I see, going back to the question I asked you, if Mr. Harvey had said, I never even dealt with you, all I do is I paid $1.2 million for this property,  I want to move the Hayes family out. And you're saying you can't do that. Absent cause is one of the other reasons for eviction. No, you cannot do that. It's under federal law. So that's your position that good cause does fall within the parameters of a reason or an ability of the landlord to remove the tenant, and that that applies in the enhanced voucher, right? That's correct, Your Honor. Where does that come from? Is it just implied? No, Your Honor. There's actually a separate statutory provision, 12 U.S.C. 1715 V-1B. It's a bit of a mess. But it is technically state-state. Congress says that in a lease of an enhanced voucher tenant must include a for-cause eviction component. So reading those two together, I think that's the answer. And for-cause includes those things that Judge Fischer just enumerated, right? That's correct. Let me ask you a question about project because you heard Ms. Garland say that her reading of the statute was, if Mr. Harvey actually had cause, that is, he chose to withdraw this unit from the rental market because he wanted to move his daughter in, that the statute would obligate him to put the Hayes family into one of his other owned units if they were available and open. Is that how HUD reads the statute too? If those other units were in the project and they were otherwise suitable or they were of the correct size, if there are other requirements required. Is there anything in HUD's guidance that's out there that says that? No, I mean HUD has not opined specifically on that question. The guidance does say that the right to remain attaches to the project. So that should be questioned. And that hasn't, to your knowledge, that hasn't been litigated anywhere in the country? Not to my knowledge, Your Honor. But your reading on behalf of HUD is that right to remain means, not right to remain in this unit that I'm in, but right to remain in any unit you happen to own that was once a part of this project. Your Honor, I mean, because we haven't put it down, I'm hesitant to take that position. I believe it's my right to try to get a question in several times. Well, I have a question here. I also wanted to go back. Just to be clear on the good cause, 982.310 gives a definition of good cause. What is HUD's position as to whether that definition is limited to the regular voucher program or that definition applies equally to enhanced vouchers? HUD's position is that it applies equally to the enhanced voucher provision. And, in fact, the proposed regulation, which is still pending, strictly links the two, so for the enhanced voucher provision, you have to have calls with it as defined in 982.310. And what is the precise status of the proposed regulation? Your Honor, I'll say it remains pending. Going back to the topic we had been on, if I understood you correctly previously, you're saying that the right to remain in the project is the former project. So the obligation of Mr. Harvey, as you and your colleagues have suggested, to find another unit is not only because he purchased six units, which still meets the definition of project, but that would be an obligation not only on him, but on any other purchaser, even of an individual unit that had previously been within the project? Is that really HUD's position? I mean, Your Honor, like I said, having that briefed here, I don't want to definitively say that's not an issue that's been litigated or presented here about what would happen if there were another unit available by another owner. I mean, I could say that, and I would say, obviously, if another owner purchases a unit in a former project-based assistance project, then that owner would be subject to and aware of the enhanced voucher provision. So it wouldn't be so surprising that that person would. HUD's guidance has been clear on the general right to remain since 2000, but it's never been clear on a right to move. It's never had. No, HUD has never taken a position on that as far as I know. So that's why I'm hesitating to say what it could be. Can I just go back to the questions at the end of Ms. Garland's presentation? Judge Shigeru has asked about Skidmore deference, and we've talked about that a bit. I have a question. What is Skidmore deference? Can anybody explain why a PC circuit recently says Skidmore deference means no deference? Your Honor, you know, that may be a question for the Supreme Court, but, you know, I guess I would view that as a thumb on the scale. I mean, if there were some doubts or ambiguity as to what the statutory text meant, the fact that HUD has adopted this position and given its expertise and its knowledge of what kind of its intent is, I mean, it's been involved in this area. It sounds like the judge has the discretion to put the thumb on the scale if the judge wishes to do so. Otherwise, so what? If you're making that up, I'm persuasive. Then, yes, I'm obviously not compelling to you. Mr. Sendak, Park Village, that's not a non-renewal case, right? Your Honor, I'm not sure about that. I think it's not clear, and I'd say why it's not clear if I can explain that. Well, my bigger question is, is this a case of first impression issue or am I having trouble finding a case that directly is on point in terms of someone making a decision to not renew rather than trying to change the tenant midstream? If I may answer this. So a couple of things. One is if you look at the, I think it's a G&T case. I'm sorry, which one? It's either John T. or G&T. It's a district court case. And, yes, the VEDS case, I think those both involve non-renewals. In terms of Park Village, first of all, it cites HUD's guidance at great length, including the part about continuously renewing the lease in agreement with HUD's guidance. So I think on that front, it would be a good look. I just didn't get to. Okay. And there always is a non-renewal. Thank you very much, Mr. Sendak. Thank you, Your Honor. Ms. Garland, you have a vote. Thank you. So many questions. Judge Hardiman, in response to your question, this is not a case of first impression. The SOS case and the Barrientos case were specifically cases of renewals as opposed to the initial opt-out. But, frankly, I think the issue is the same, whether it's the initial opt-out or whether it's the lease renewal. Because when the project lease contract ends, those leases end. So it is at the transition point between project-based to enhanced voucher, that is the end of the lease term. So if there's no right to remain at the end of the lease term, then there's no right to remain at that initial opt-out. Our position is that everyone seems to agree good cause is required during the term of the lease. And all subsidized housing, including the regular voucher program, good cause is required. So the question we're trying to decide in this case is not whether or not good cause is required during the term of the lease, but whether good cause is required at the end of the lease term in this particular set of facts. But this has serious implications for whether or not there is a right to remain at that opt-out. And I think HUD, Congress, and all of the other circuits and district courts who have ruled on this issue have been very clear that at the point of opt-out, there's a right to remain. So if it's not just a financial right at the opt-out point, if there's something more to the enhanced nature of the voucher, if the enhanced nature is not just a financial right, but it's some type of choice that's given to the tenant and that exists at the opt-out point, it therefore must exist upon lease renewal. Now, this is not an absolute right to remain, as you were asking. This is a very finite right to remain. And there are certain confines that are put on that right to remain. The tenant has to be a good tenant, first of all. So any of the good cause provisions that would apply during the lease term still have to apply at the end of the lease term. And you can't not pay your rent. You can't destroy the unit. You can't sell drugs out of the unit. None of that can happen in the unit and have Congress still require that you stay in the unit. And it is further constrained by that it's just for this original family. In a project-based subsidy, those units were often passed on from one generation to the next where new family members would be moving into the unit or, you know, when that family moves out, new families moving into the unit would benefit from that subsidy. The enhanced voucher program is a small little program. It's a finite program, which is just saying this particular family, just as you were saying, just this particular family gets grandfathered in. What about a project, though? Can you answer the question that's come up a couple of times? When does a project cease to be a project, or does it ever cease to be a project? How does it change building? Yeah. Assume that we had three or four iterations, that is, people selling to people who are selling to people, so that what had been a 30-unit project to start with now was in the hands of 30 different owners, thrice removed from the original. Your position, if I understand it, is that if any one of those 30 owners actually had an available unit and somebody could move the family out, that because that was an originally part of the project, they would have a right to go into that other person's house, into that unit, and say, you were part of the project, move me in. Is that the position? You may, of course, answer the question. Thank you. That seems like a bit of a stretch. I know HUD was willing to go there today. I'm not sure I'm willing to go there today. I think for this particular case, Mr. Harvey purchased a building that had six units in it. Three of them are one-bedrooms. Those are not options. Three of them are three- or four-bedrooms, which are options for the family. Family lives in one. If Mr. Harvey wants to move his daughter into that particular unit, Mr. Harvey has the option to move his family to either of these other two units. So for all intents and purposes, right now, project means those six units and that particular building. Thank you, Ms. Bell. Thank you. Thank you to counsel for the parties. We also thank counsel for the amicus, for your contribution. The involved court will take the matter under advisement, and I'll ask the clerk to adjourn the proceeding. Good work.